IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOHN SHOEMAKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Civil Action No. 3:25-CV-2558-D |
| | § | |
| MCKESSON CORPORATION, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this action by plaintiff John Shoemaker ("Shoemaker") against defendant McKesson Corporation ("McKesson") alleging retaliation, in violation of the Family and Medical Leave Act of 1993 ("FMLA"), McKesson moves for summary judgment. Concluding that a reasonable jury could find in Shoemaker's favor on his retaliation claim, the court denies the motion.

I

Shoemaker joined McKesson in October 2022, eventually becoming its Senior Director of Business Enablement and Transformation.[1] In this role, Shoemaker oversaw operations in McKesson's "contact center," which is a support hub for its customers. In the spring of 2024 McKesson began planning to restructure the contact center. John Garcia

[1]In recounting the factual background, the court summarizes the evidence in the light most favorable to Shoemaker as the summary judgment nonmovant and draws all reasonable inferences in his favor. *See, e.g.*, *Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

("Garcia"), a McKesson Senior Vice President who initially led this restructuring, anticipated that it would require a reduction in existing personnel. Garcia needed additional skill sets and hired Erica Tyler ("Tyler") in November 2024 to serve as McKesson's Vice President of Contact Center Services and to lead the ongoing transformation. Tyler's role was to "evaluat[e] the positions in the contact center, determin[e] what work would continue, [and] identif[y] what roles should be eliminated . . . ." D. Br. (ECF No. 19) at 5. Shoemaker became her direct report.

Unfortunately for Shoemaker, Garcia and Tyler agreed to eliminate his position.[2] The timing and finality of this decision are in dispute. McKesson maintains that Tyler and Garcia came to an agreement in December 2024 to terminate Shoemaker. The earliest documentary evidence in the summary judgment record is a PowerPoint that identifies Shoemaker, among several other redacted names, as holding "[r]ole[s] to be transitioned out."[3] D. App. (ECF No. 20) at 143-44. It also describes the hiring of a "Transformation Lead," which McKesson asserts was a leadership position that would oversee the contact center's transformation. McKesson contends that this PowerPoint constituted the "final plan for the Contact Center reorganization." D. Br. (ECF No. 19) at 7.

The day after the PowerPoint was last modified (January 13, 2025), Shoemaker

---

[2]Shoemaker maintains that his role was not "eliminated" but that he was replaced under the guise of an elimination. P. Resp. (ECF No. 22) at 16-17. The court need not resolve this question to decide McKesson's motion.

[3]The PowerPoint's metadata are before the court and reflect that the PowerPoint was last modified on January 13, 2025.

contacted a McKesson Human Resources employee, Canden Privatsky ("Privatsky"), and began a series of conversations about McKessons' paternity leave policy. Shoemaker expressly asked Privatsky to keep these conversations private due to complications with his wife's last pregnancy. Then, on February 17, 2025, Shoemaker discovered an organizational chart that reflected changes to his role. He inquired with Tyler, who encouraged him to apply for the planned Transformation Lead position. He did not. The following day—still before Shoemaker had announced his planned paternity leave—Tyler created and sent a "Business Case Questions" form that again reflected the elimination of Shoemaker's role. D. App. (ECF No. 20) at 96.

On March 3, 2025 Shoemaker formally notified Tyler about his wife's pregnancy and his intention to take paternity leave later that spring. According to McKesson, this was Tyler's first notice that Shoemaker intended to take paternity leave. McKesson maintains that, contemporaneously, Tyler and Privatsky decided to notify Shoemaker of his termination on April 11, 2025. McKesson does not specify a date for this decision, asserting only that it occurred sometime in "early March." D. App. (ECF No. 20) at 139.

On April 9, 2025 Shoemaker formally requested FMLA leave. Two days later, on April 11, 2025, McKesson notified him of his upcoming termination. Two relevant events occurred following Shoemaker's termination notice: first, McKesson hired Deni Viggiano ("Viggiano") for the Transformation Lead role; and, second, the remaining employees identified in the reduction in force ("RIF") were terminated in July. The parties contest the nature of Viggiano's role, the later-fired employees' roles, and how they both compare to

Shoemaker's position.

In sum, based on the summary judgment record, a reasonable jury could find the following: McKesson had been considering eliminating Shoemaker's position by December 2024 as part of a RIF; Shoemaker formally notified Tyler about his plan to take paternity leave on March 3, 2025, while McKesson continued through February and March to contemplate terminating Shoemaker; in early March, Tyler selected April 11 as the termination notice date; Shoemaker requested FMLA leave on April 9, 2025 and received the termination notice on April 11, 2025; and the remaining employees included in the RIF were terminated in July.

McKesson moves for summary judgment on Shoemaker's sole claim of FMLA retaliation. Shoemaker opposes the motion, which the court is deciding on the briefs, without oral argument.

## II

When a summary judgment movant will not have the burden of proof on a claim at trial, it can obtain summary judgment by pointing to the absence of evidence on any essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Once the moving party does so, the nonmovant must go beyond his pleadings and designate specific facts to demonstrate that there is a genuine issue of material fact for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The

nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *TruGreen LandCare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

III

Before turning to the merits of McKesson's summary judgment motion, the court considers certain objections and motions to strike that McKesson and Shoemaker make to the other party's summary judgment evidence. The court need only resolve objections that pertain to summary judgment evidence that the court is relying on in making its decision. All other objections and motions to strike are denied as moot.

A

McKesson objects to, and moves to strike, ¶ No. 18 of Shoemaker's declaration, contending that it is conclusory and not based on personal knowledge.

"[T]he contents of affidavits and declarations must . . . be based on personal knowledge." *Kilmon v. Saulsbury Indus., Inc.*, 2017 WL 10729148, at *2 (W.D. Tex. Sept. 29, 2017). As a former employee of McKesson, Shoemaker has sufficient personal knowledge to testify to his ongoing projects that remained active at the time of his termination. And because Shoemaker prepared a transition plan for his role, there is "enough factual support" to establish that he also had personal knowledge of the work that would be transitioned. P. App. (ECF No. 23) at 128-29; *Gahagan v. U.S. Citizenship & Immigr. Servs.*, 147 F.Supp.3d 613, 621 (E.D. La. 2015). Accordingly, the court overrules

McKesson's objection to ¶ No. 18 of Shoemaker's declaration.

B

Shoemaker objects to ¶¶ Nos. 9, 13, and 16 of Tyler's declaration on the grounds that they are conclusory and not based on personal knowledge. These paragraphs describe Shoemaker's and the other employees' roles at McKesson and the scope of their duties. In her position as Vice President of Contact Center Platforms and Services, Tyler has personal knowledge of Shoemaker's and the other employees' positions. Therefore, Tyler can testify as to whether Shoemaker's duties had ended and whether his role differed from other employees. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) ("personal knowledge and competence to testify are reasonably inferred" from a declarant's position "in the matters to which they swore." (quotations omitted)). Accordingly, the court overrules Shoemaker's objections to ¶¶ Nos. 9, 13, and 16 of Tyler's declaration.

C

Similarly, Shoemaker objects to ¶¶ Nos. 13 and 15 of Garcia's declaration. Garcia—as the Senior Vice President of McKesson Technology Acceleration & Contact Center Services—has personal knowledge of Shoemaker's and the other employees' roles. Therefore, the court overrules Shoemaker's objections to ¶¶ Nos. 13 and 15 of Garcia's declaration.

D

Shoemaker objects to the business records attached to Tyler's declaration, asserting that they do not meet the standards of Fed. R. Evid. 803(6). The court disagrees. Tyler's

"qualified witness" testimony establishes that the exhibits were "made at or near the time by . . . someone with knowledge[,]" "kept in the course of a regularly conducted activity[,]" as "a regular practice of that activity[.]" Fed. R. Evid. 803(6). And Shoemaker has not shown that "the source of information . . . indicate[s] a lack of trustworthiness." *Id.* Therefore, the court overrules Shoemaker's objections to the business records attached to Tyler's declaration.

IV

The court now turns to the merits of Shoemaker's FMLA claim.

Because Shoemaker relies on circumstantial evidence, his FMLA claim is properly analyzed under the *McDonnell Douglas* burden shifting framework. *See e.g.*, *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001) ("The Fifth Circuit applies the *McDonnell Douglas* framework to analyze retaliation claims under the FMLA[.]"). Under *McDonnell Douglas,* the plaintiff's first burden is to establish a prima facie case of retaliation. *Id.*

> To establish a prima facie case for ... retaliation under the FMLA, a plaintiff must demonstrate that [he] is protected under the FMLA; [he] suffered an adverse employment decision; and that [he] was treated less favorably than an employee who had not requested leave under the FMLA or that the adverse decision was made because of [his] request for leave.

*Comeaux-Bisor v. YMCA of Greater Hous.*, 290 Fed. Appx. 722, 724-25 (5th Cir. 2008) (per curiam) (citing *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 384 (5th Cir. 1998)). "[O]nce an employee has established a prima facie case of retaliation, the burden shifts to the

employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Stroud v. BMC Software, Inc.*, 2008 WL 2325639, at *3 (5th Cir. June 6, 2008) (FMLA case) (per curiam) (unpublished opinion). "If the employer succeeds in doing so, the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason is a pretext for [retaliation]." *Richardson v. Monitronics Int'l, Inc.,* 434 F.3d 327, 332-33 (5th Cir. 2005).

The *McDonell-Douglas* framework is slightly altered when, as here, the plaintiff alleges that retaliation "was a motivating factor in [his] termination," although not the only factor. *See Richardson.* 434 F.3d at 333; P. Resp. (ECF No. 22) at 15, 20 (quoting the "mixed motive analysis" and stating that "a reasonable jury could find that Shoemaker's FMLA request motivated the termination or its timing . . . "). In these cases, the first two steps are unchanged. *Richardson.* 434 F.3d at 333. But at the third step, Shoemaker can survive summary judgment either by (1) showing that McKesson's "proffered reason is a pretext for" retaliation, or (2) showing "that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination." *Id.* If the employee demonstrates at the third step that retaliation was a motivating factor, "the burden again shifts to the employer, this time to prove that it would have taken the same action despite the [retaliatory] animus." *Id.*

V

The court considers first whether Shoemaker has established a prima facie case of retaliation under the FMLA.

A

To establish his prima facie case, Shoemaker must demonstrate that (1) he "engaged in protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action." *DeVoss v. Sw. Airlines Co.*, 2017 WL 5256806, at *7 (N.D. Tex. Nov. 13, 2017) (Fitzwater, J.), *aff'd*, 903 F.3d 487 (5th Cir. 2018).

B

The parties do not dispute the first two elements.

C

As to causation, the "initial requirement that a plaintiff show a 'causal link' is less stringent than the 'but for' causation that a jury must find." *Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (citing *Long v. Eastfield Coll.,* 88 F.3d 300, 305 n.4 (5th Cir. 1996)). Shoemaker is only required to show that "the protected activity and the adverse employment action are not completely unrelated." *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006). This is a "minimal" burden. *Khanna*, 2000 WL 1801850, at *4.

"Close timing between an employee's protected activity and an adverse action against him may provide the causal connection required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (quotations omitted). Many cases turn on the timing between the protected conduct and the adverse employment action. *See, e.g.*, *Johnson v. Epsilon Data Mgmt., LLC*, 2024 WL 5240151, at

*8 (N.D. Tex. Dec. 27, 2024) (Fitzwater, J.) (holding that a "temporal proximity" of "fewer than three months" satisfied the "causation element" of the prima facie case) (Title VII case) *and Martin v. Penske Logistics, LLC*, 736 F.Supp.3d 437, 455-56 (N.D. Tex. 2024) (Boyle, J.) (holding that "approximately one month" was sufficient to establish a causal connection).

Shoemaker submitted his formal request for FMLA leave on April 9, 2025. Tyler and Privatsky met with him just two days later to give him notice of his termination. This "close timing" between the "protected activity and an adverse action" satisfies the "minimal" burden to show causation. *See Khanna,* 2000 WL 1801850, at *4 (quotations omitted).[4]

McKesson contends, however, that Shoemaker cannot satisfy the causation element because causation cannot exist when a defendant takes an adverse employment action without knowledge of the protected conduct. *See, e.g.*, *Williams v. Sterling Healthcare Servs., Inc.*, 193 Fed. Appx. 328, 331 (5th Cir. 2006) (per curiam). McKesson maintains that Shoemaker had not engaged in FMLA protected conduct when McKesson made the decision to terminate him.

Shoemaker has not established prima facie causation as to McKesson's initial decision to terminate him as part of the RIF. The record shows that McKesson decided to terminate Shoemaker as part of a normal business restructuring that was planned well before

[4]The burden is met even when evaluating the "early March" date that McKesson asserts was when Tyler chose the April 11, 2025 termination notice date. One month is well within the temporal proximity required to establish prima facie causation. *Martin*, 736 F.Supp.3d at 455-56. Furthermore, because the decision occurred in "early March," an even shorter time elapsed after Shoemaker's formal notice.

Shoemaker put Tyler and Garcia on notice of his intent to take paternity leave.[5] And Shoemaker has not introduced sufficient evidence for a reasonable jury to find that McKesson's decision to terminate him in the RIF was not finalized by March 3, 2025, the notice date.[6] Therefore, no reasonable jury could find a "causal link" between the FMLA leave request and the general decision to terminate Shoemaker as part of the RIF. *See Khanna*, 2000 WL 1801850, at *4.

But the analysis is different for the April 11, 2025 date. McKesson maintains that Tyler had also chosen the April 11, 2025 date before McKesson was aware of Shoemaker's protected conduct, sometime in "early March." D. Br. (ECF No. 19) at 9. But this imprecise assertion only creates an issue of material fact regarding whether Tyler made the decision before she received notice on March 3, 2025. Similarly, McKesson also avers that "by mid-January 2025, Tyler and Garcia decided to eliminate Shoemaker's role first." D. Br. (ECF No. 19) at 15-16. But the timing of when Tyler and Garcia reached this decision (rather than

[5]Shoemaker seems to contest that his discussions with Privatsky imputed knowledge of his planned leave to Tyler and Garcia. But he has not introduced any non-speculative evidence that Privatsky (despite his request otherwise) informed Tyler and Garcia of his planned paternity leave. And Tyler's unrefuted declaration shows the opposite; Privatsky "did not tell me . . . before Mr. Shoemaker shared the news himself." D. App. (ECF No. 20) at 139.

[6]Tyler and Garcia both testified that the decision to terminate Shoemaker was made in late 2024. The PowerPoint and the Question Form also confirm this testimony. In response, Shoemaker attempts to cast doubt by asserting that more evidence of his termination should exist according to McKesson's internal procedures. This is insufficient. Shoemaker must at least create an issue of fact, not point out that McKesson could have introduced more evidence. *See Little*, 37 F.3d at 1075.

why) is not supported in the cited depositions nor in the Tyler or Garcia declaration. And, even if it were, it does not establish exactly when that early termination would be, only that it would be earlier than the other employees. This leaves the possibility that, although earlier, Shoemaker's notice of termination was still accelerated to April 11, 2025 because of his FMLA leave.[7]

The foregoing demonstrates that there is at least a genuine issue of material fact regarding whether "[McKesson] had knowledge of the protected activity" when it chose the April 11, 2025 date, as is required to establish causation. *Standley v. Rogers*, 202 F.Supp.3d 655, 667 (W.D. Tex. 2016). Therefore, focusing on April 11, the court holds that Shoemaker has introduced sufficient evidence to establish that "the protected activity and the adverse employment action are not completely unrelated." *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006). Shoemaker has satisfied his initial burden to

---

[7]Acceleration of a pre-determined termination can be a separate act of retaliation. *Russo v. N.H. Neurospine Inst., P.A.*, 2026 WL 2491680, at *11 (1st Cir. Aug. 25, 2026) (unpublished opinion) (holding that "accelerat[ing]" a "termination" constituted an adverse employment action); *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (holding that an adverse action existed when a plaintiff was fired "sooner than she otherwise would have been" because of her protected conduct); *Lee v. W. Va. Univ. Med. Corp.*, 181 F.4th 424, 438 (4th Cir. 2026) (same). This view has been applied in district courts in the Fifth Circuit. *See Penders v. Saint Edward's Univ., Inc.*, 2024 WL 4744060, at *12 (W.D. Tex. Mar. 18, 2024) (holding that being "terminated immediately" instead of a planned later date can be the locus for the prima facie causation analysis); *Allain v. Bd. of Supervisors of Univ. of La. Sys.*, 81 F.Supp.3d 502, 511-12 (W.D. La. 2015) (holding that causation was established even though defendant "had decided to terminate" the plaintiff before she took FMLA leave because the defendant "did not in fact terminate her at that time.") (FMLA case). In essence, "planning to terminate an employee and then carrying out the termination are different things." *D'Agostino v. Kendall*, 2021 WL 4860095, at *11 (D.N.J. Oct. 19, 2021).

establish a prima facie case of retaliation under the FMLA.

VI

Because Shoemaker has established a prima facie case of retaliation, the burden now shifts to McKesson to articulate a legitimate, nonretaliatory reason for Shoemaker's termination on April 11, 2025. *Esparza v. Bank of Am., N.A.*, 2013 WL 5208024, at *8 (N.D. Tex. Sept. 17, 2013) (Fitzwater, J.). McKesson must "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Jackson v. Fed. Exp. Corp.*, 2006 WL 680471, at *5 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) (citation omitted). This burden is "one of production, not proof, and involves no credibility assessments." *Id.* (citation omitted).

McKesson has met its burden of production to establish a nonretaliatory reason for notifying Shoemaker of his termination on April 11, 2025. In essence, McKesson maintains that Shoemaker was terminated earlier than the other employees because the nature of his role was different, in that "his responsibilities either had ended, had a limited lifecycle, or were not going to continue in the same form" and that his salary was required to "budget for the new Transformation Lead role." D. Br. (ECF No. 19) at 15-16; D. App. (ECF No. 20) at 91. The court holds that McKesson has introduced sufficient evidence to support the finding that "unlawful discrimination was not the cause of the employment action." *Jackson*, 2006 WL 680471 at *5.

VII

Because McKesson has met its burden to produce evidence of a nonretaliatory reason for Shoemaker's early termination on April 11, the burden shifts back to Shoemaker to show that "the employer's proffered reason is a pretext for [retaliation], or . . . that the employer's reason, although true, is but one of the reasons for its conduct, another of which was [retaliation.]" *Richardson,* 434 F.3d at 333. At the summary judgment stage, Shoemaker need only raise a genuine issue of material fact. *See, e.g., Jackson*, 2006 WL 680471, at *6 ("Because [defendant] has satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff's] discharge, in order for [plaintiff] to survive summary judgment, he must create a genuine and material fact issue regarding the ultimate question of discrimination."). Because Shoemaker relies on the traditional pretext framework and the mixed-motive analysis, the court will consider them together.

"[T]emporal proximity alone is insufficient" to show pretext or a mixed motive. *Strong v. Univ. Healthcare Sys., LLC*,482 F.3d 802, 808 (5th Cir. 2007). Therefore, for plaintiffs to meet their burden, they must couple evidence of temporal proximity with proof of an additional factor that evinces a retaliatory motive. *Robles v. Eminent Med. Ctr., LLC*, 619 F.Supp.3d 609, 632 (N.D. Tex. 2022) (Lindsay, J.) (holding that temporal proximity and defendant's hostile remarks were sufficient to show motivating factor); *Allain v. Bd. of Supervisors of Univ. of La. Sys.*, 81 F.Supp.3d 502, 513 (W.D. La. 2015) (holding that temporal proximity and inconsistencies in defendant's evidence were sufficient to show pretext and mixed motive); *White v. Premium Velocity Auto LLC*, 2026 WL 571212, at *7

(N.D. Tex. Mar. 2, 2026) (Boyle, J.) (holding that temporal proximity and defendant's documented skepticism of plaintiff's FMLA basis were sufficient to show pretext); *Khanna*, 2000 WL 1801850, at *4 (holding that temporal proximity and apparent incongruities in defendant's case were sufficient to show pretext); *and see Watkins v. Tregre*, 997 F.3d 275, 285-86 (holding that the "[w]hen combined with [defendant's] discredited reason . . . the near-immediate temporal proximity of the discharge to the protected activity leaves us with no room to doubt" that the plaintiff survives summary judgment).

Shoemaker advances several reasons to support the conclusion that McKesson's justifications are pretextual or are mixed with a retaliatory motive.[8] The court need only consider two: the "suspicious" temporal proximity and McKesson's choice to "terminate Shoemaker [after taking FMLA leave] before anyone else in the purported RIF." P. Resp. (ECF No. 22) at 15-16.

There is no doubt that the present temporal proximity strongly shows retaliation.[9] *Watkins*, 997 F.3d at 285-86. But because this is "insufficient alone," Shoemaker must create an issue of fact that he otherwise belonged in the July RIF, thereby showing that the FMLA leave influenced his earlier firing. *Strong*, 482 F.3d at 808. In the court's analysis of pretext and mixed motive, Shoemaker's position that he was similar to the July RIF employees

---

[8]Shoemaker also draws the court's attention to the Transformation Lead role and whether he or Viggiano was more qualified. Viggiano's role is only relevant to the extent that she worked on Shoemaker's continuing responsibilities or active projects.

[9]This is true regardless whether the April 11 date was actually chosen in early March because of its proximity to Shoemaker's formal notice on March 3, 2025.

affects both: it shows that McKesson's reason for his early firing is pretextual *and* it advances independent evidence of a retaliatory motive.[10]

The parties contest the nature of Shoemaker's role and the roles of the employees terminated in July. D. Br. (ECF No. 19) at 16-18; P. Resp. (ECF No. 22) at 16-17. McKesson contends that Shoemaker's "responsibilities either had ended, had a limited lifecycle, or were not going to continue in the same form." D. Br. (ECF No. 19) at 16; D. App. (ECF No. 20) at 91, 134, 138. Therefore, McKesson decided to terminate him first. *Id.* In contrast, Shoemaker asserts that "substantial work for which [he] was responsible remained active" and that he created a transition plan for his responsibilities. P. App. (ECF No. 23) at 128.[11] Shoemaker's assertions are buttressed in several aspects. Marsh, a McKesson employee who worked closely with Shoemaker, testified that Shoemaker's "job functions did not cease" when he was terminated. P. App. (ECF No. 23) at 107, 110 (testifying that Viggiano "stepped into [Shoemaker's] shoes . . . "). Indeed, Marsh, Tyler, and then an outside firm took over Shoemaker's responsibilities. But aside from Marsh,

---

[10]Shoemaker's similarity to the July RIF employees evinces retaliation because it shows that McKesson had an original plan for his termination (July) that was then accelerated due to the FMLA leave. The court construes this differently from a disparate treatment argument, where a plaintiff complains that he was nearly identical to a person who was treated differently. *See, e.g., Kiel v. Tex. Parks & Wildlife Dep't*, 2016 WL 7616532, at *2 (W.D. Tex. June 16, 2016).

[11]"This included recurring meeting series, contact-center strategy and transformation work, CCaaS and workforce-management requests for proposals, onboarding of business units and program participants, project requests, vendor matters, stakeholder communications, and communities of practice." P. App. (ECF No. 23) at 128.

Tyler testified that a portion of Shoemaker's work was transitioned to Viggiano and others.[12]

The credibility of Marsh, Shoemaker, Tyler, and Garcia, or the weight of their testimony, is not for the court to decide. *Servicios Comerciales Lamosa, S.A. de C.V. v. De la Rosa*, 328 F.Supp.3d 598, 610 (N.D. Tex. 2018) (Lindsay, J.). Therefore, the dispute about Shoemaker's role creates an issue of material fact regarding whether Shoemaker's "responsibilities either had ended, had a limited lifecycle, or were not going to continue in the same form," so as to justify the early termination. D. Br. (ECF No. 19) at 16; *Little*, 37 F.3d at 1075.

As to the other employees, McKesson asserts that, unlike Shoemaker, their responsibilities continued until their termination date. Taking this as true, and based on the dispute regarding Shoemaker's role, the court holds that Shoemaker has created a genuine issue of material fact regarding whether his role was in fact distinguishable from the others so as to justify exclusion from the July RIF.

Therefore, Shoemaker has created a genuine issue of material fact concerning whether McKesson's reasons are pretextual or whether a motivating factor for his termination was his decision to take FMLA leave. "[V]iewing all of the evidence in its totality and in the light most favorable" to Shoemaker, "the near-immediate temporal proximity" of the termination, coupled with the factual dispute regarding the reasons for Shoemaker's exclusion from the July RIF, leave the court "with no room to doubt that" Shoemaker has met

[12]The witnesses disagree on the portion of Marsh's work that continued, but that difference is not for the court to resolve at summary judgment.

his burden. *Watkins*, 997 F.3d at 285-86 (overturning summary judgment).

VIII

Finally, under the mixed motive analysis, McKesson must show "that it would have taken the same action despite the [retaliatory] animus." *Richardson,* 434 F.3d at 333.

There is a genuine issue of material fact concerning whether the basis for Shoemaker's exclusion from the July RIF was actually due to the nature of his role as compared to the other RIF employees. *See supra* § VII. It is for the trier of fact, not the court, to weigh the credibility of the witnesses and determine the true basis for his termination. Therefore, the court denies McKesson's motion for summary judgment on Shoemaker's retaliation claim.

* * *

For the reasons explained, the court denies McKesson's motion for summary judgment.

**SO ORDERED**.

September 9, 2026.

Sidney A. Fitzwater

SIDNEY A. FITZWATER
SENIOR JUDGE